**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___05/30/2024___

| | |
|---|---|
| Cleopatra Egypt, | |
| Plaintiff, | |
| -against- | |
| United States of America, | |
| Defendant. | |

**1:23-cv-02930 (JGLC) (SDA)**

**REPORT AND RECOMMENDATION**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

**TO THE HONORABLE JESSICA G. L. CLARKE, UNITED STATES DISTRICT JUDGE:**

In this action, *pro se* Plaintiff Cleopatra Egypt ("Plaintiff" or "Egypt") brings claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2401(b), 2671-80, arising out of dental health services provided by the Institute for Family Health (the "Institute"), which is a federally qualified health center ("FQHC"). Pending before the Court is a motion by Defendant United States of America ("Defendant" or "Government"), pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiff's Second Amended Complaint ("SAC"). (Def.'s 1/5/24 Mot. to Dismiss, ECF No. 25.)

For the following reasons, it is respectfully recommended that Defendant's motion be GRANTED IN PART and DENIED IN PART.

## FACTUAL ALLEGATIONS[1]

### I.   Background

As an FQHC, the Institute provides, among other services, dental care at select locations in New York City, including a clinic in Harlem (the "Institute Clinic"). Since 2012, Egypt has been a patient with the Institute Clinic. (SAC, ECF No. 6, at PDF p. 5.) Dr. Demetra Atsaves, the Institute Clinic's director, was Egypt's primary doctor. (*Id*.)

Between May 2017 and December 2020, Egypt had many visits with the Institute Clinic, ranging from restorative dental consultations for Tooth No. 15[2] (SAC at PDF pp. 30-35), to extractions of neighboring teeth (*id*. at PDF p. 32 (dental record noting an "Ext" known as an "extraction"[3] of Tooth No. 14)), to denture adjustments. (*Id*. at PDF pp. 33-34, 43-45.) There also were occasions where Tooth No. 15 was assessed, and a fracture line was noted and was planned to be treated with a resin repair or else replaced. (*Id*. at PDF pp. 35-38.) In addition, Egypt had consulted the Institute for a replacement denture to either alleviate pressure on surrounding teeth or to allow soft issue to heal. (*Id*. at PDF pp. 39-40.)

---

[1] For purposes of the Rule 12(b)(6) motion to dismiss, the Court assumes that the well-pleaded allegations of the SAC are true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Court also considers the documents that Plaintiff attached to the SAC. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

[2] The American Dental Association (the "ADA") created the "ADA Universal Tooth Designation System" that is "accepted and approved by the ADA and is the most commonly used system by dental professionals in America." *ADA Universal Tooth Designation System*, Am. Dental Ass'n (Aug. 2022), https://www.ada.org [https://perma.cc/2HA8-4PEQ] [hereinafter ADA Universal Tooth Designation System]. Tooth No. 15 is the "permanent maxillary left second molar tooth." *Id*.

[3] *Charting Symbols and Standardized Abbreviations Useful for Documenting Dental Hygiene Care*, Dental Abbreviations, Symbols, and Acronyms, Am. Dental Ass'n (2d ed. Chicago, Ill., 2005), [https://perma.cc/3GZQ-LHRF] [hereinafter ADA Charting Symbols].

On December 20, 2018, Egypt saw Dr. Atsaves at the Institute Clinic for treatment of a "small carious lesion" on the distal of Tooth No. 21 and an assessment with respect to a partial maxillary/mandibular edentulism[.]"[4] (SAC at PDF pp. 45-46.) Thereafter, Egypt continued to consult the Institute for restorative dental treatment. (*Id.* at PDF pp. 46-47.) On July 9, 2020, Egypt visited Dr. Atsaves to try on a partial denture. (*Id*. at PDF p. 51.) During that appointment, Dr. Atsaves recommended that Egypt schedule a visit for an annual dental check-up and to have a full set of x-rays because Egypt "really need[ed] it." (Pl.'s 2/12/24 Opp. Mem., ECF No. 33, at 6.)[5]

The Institute Clinic scheduled a follow-up appointment for December 23, 2020, with Dr. Deborah Tirsun, a resident[6] dentist at the Institute who was employed by Mount Sinai Hospital, regarding Egypt's denture. (SAC at PDF pp. 5, 52; *see also* Discussion Section I.B.1, *infra*.) Egypt

---

[4] "Maxillary" refers to the upper jaw. *Maxillary*, Stedman's Medical Dictionary, No. 531810 (Database Updated Nov. 2014, available on Westlaw). "Mandibular" refers to the lower jaw. *Mandibular*, Stedman's Medical Dictionary, No. 525750 (Database Updated Nov. 2014). "Edentulism" typically refers to a treatment plan where "severity of tooth loss can be rehabilitated by different types of fixed or removable constructions which are retained by the remaining natural teeth or dental implants, or in cases of edentulism, are supported directly by the oral mucosa." *Swedish Council on Health Technology Assessment (SBU)*, *Prosthetic Rehabilitation of Partially Dentate or Edentulous Patients: A Systematic Review*, Nat'l Library Medicine (Nov. 2010), https://www.ncbi.nlm.nih.gov [https://perma.cc/69WQ-U35T].

[5] "In evaluating the legal sufficiency of a *pro se* plaintiff's claims, a court may rely on the plaintiff's opposition papers." *Vlad-Berindan v. MTA N.Y.C. Transit*, No. 14-CV-00675 (RJS), 2014 WL 6982929, at *6 (S.D.N.Y. Dec. 10, 2014) (citing cases). Thus, the Court herein relies upon Plaintiff's opposition papers, in addition to the allegations contained in the SAC.

[6] A "resident" dentist, like a resident physician, often refers to an individual who is "attached to a hospital for clinical training[.]" *Resident*, Stedman's Medical Dictionary, No. 775240 (Database Updated Nov. 2014). By contrast, An "attending" dentist, like an attending physician, often refers to the individual "responsible for the care of a patient" or the individual "supervising the care of patients by interns, residents and/or . . . students." *Attending Physician*, Stedman's Medical Dictionary, No. 687750 (Database Updated Nov. 2014).

alleges that the change in dental physicians at the Institute from Dr. Atsaves to Dr. Tirsun was a "calculated transfer" since Dr. Atsaves was "motivated by money," which Egypt believes to be true since Dr. Atsaves would always ask her when she was going to get her dental implants. (Pl.'s 2/12/24 Opp. Mem. at 6.) Egypt, "in fear of Dr. [Atsaves's] abandonment of her" would respond that she was "working on it." (*Id.*) When Dr. Atsaves realized that Egypt was not going to be able to pay the out-of-pocket cost for her potential implants, Egypt alleges that Dr. Atsaves "no longer found value in continuing to care for" her. (*Id.* at 7.)

**II.    December 23, 2020 Visit**

During the December 23, 2020 visit with Dr. Tirsun, Egypt sought a replacement of her upper partial denture because it was moldy and had a black film. (SAC at PDF p. 5.) Because Egypt had twelve missing teeth—namely, Tooth Nos. 2, 3, 4, 5, 6, 14, 17, 18, 19, 30, 31 and 32—it was important that she had a safe and functioning partial denture that was free of mold and microbial growth. (*Id.* at PDF p. 7.) At the visit, Egypt stated that her lower denture was causing her pain and that it was hard for her to put it in and take it out. (*Id.* at PDF p. 53.) Dr. Tirsun refused to approve a replacement of the upper partial denture because it was "fully functional and [did] not need to be replaced or adjusted" and instead, sterilized the denture. (*Id.* at PDF pp. 5, 7, 53.) However, the black film remained on the denture. (*Id.* at PDF p. 5.) According to Egypt, Dr. Tirsun intimidated her, repeatedly asked her if she had taken her medicine that day and stated that Egypt could not afford her new dentures. (Pl.'s 2/12/24 Opp. Mem. at 9.) To address her pain in the lower denture, the area was shortened and smoothed. (SAC at PDF p. 53.) Egypt also was shown how to put in and take out the lower denture without assistance. (*Id.*)

Egypt also was experiencing pain on Tooth No. 12[7] and Tooth No. 15, and at the December 2020 visit, she "begged Dr. Tirsun to take x-rays of these two teeth to determine the reason" for her pain. (SAC at PDF p. 5.) Egypt requested that x-rays be taken in light of her twelve missing teeth to monitor bone loss and tooth decay. (*Id.* at PDF p. 7.) However, Dr. Tirsun denied the request because, according to Egypt, she was required to choose between Dr. Tirsun evaluating the denture or taking x-rays of her teeth for her annual dental exam. (*Id.* at PDF p. 5.) Dr. Tirsun indicated that she would schedule a follow-up appointment for Egypt's annual dental exam where a full set of x-rays would be taken of Egypt's entire mouth to address the pain in Tooth No. 12 and Tooth No. 15. (*Id.* at PDF p. 5.)

When the visit ended, however, Egypt alleges that Dr. Tirsun reneged on her promise and refused to give Egypt a slip to take to the appointment desk to schedule a follow-up appointment. (SAC at PDF p. 5.) According to Egypt, she begged Dr. Tirsun to allow her to schedule a follow-up appointment because of the pain she was experiencing and Dr. Tirsun indicated that she would have to discuss it with Dr. Atsaves and would call Egypt with an appointment afterwards. (*Id.*)

Plaintiff alleges that the Institute Clinic did not contact her for seven months, during which time the infections in Tooth No. 12 and Tooth No. 15 festered. (SAC at PDF p. 5.) Instead, on January 19, 2021, the Institute left Egypt a voicemail for her to schedule a dental cleaning appointment with a dental hygienist on January 26, 2021. (*Id*. at PDF pp. 15, 54, 56.) Egypt did not accept this appointment because her insurance would have denied the claim since she was

---

[7] Tooth No. 12 is the "permanent maxillary left first premolar tooth. *See* ADA Universal Tooth Designation System. *See* ADA Universal Tooth Designation System.

not due for a cleaning until May 7, 2021, and the appointment was cancelled. (*Id.* at PDF pp. 5, 15, 57.)

### III.    <u>Post-December 2020 Visit Events And Treatment</u>

Because Egypt had not heard back from the Institute with respect to her pain in Teeth Nos. 12 and 15, Egypt "had no choice but to go to" other dentists, which were few and far between given the limited number of in-network dentists who accepted Plaintiff's dental insurance. (Pl.'s 2/12/24 Opp. Mem. at 8.) On April 7, 2021, Plaintiff "tried to get a functioning [u]pper [p]atrial [d]enture by going to a dental appointment with Dr. John Letizia," which he later was unable to supply because he no longer had a laboratory to process it.[8] (SAC at PDF pp. 102-03 (emphasis omitted).) On April 20, 2021, Egypt sent a letter to Ms. Josephine Dilascio-Sanchez, the Director of Dental Administration at the Institute, to lodge a formal complaint on five grounds against Dr. Tirsun and the Institute. (*Id.* at PDF pp. 192-200.) These grounds included (1) failure to provide service, (2) financial profiling, (3) inadequate service, (4) failure to provide service, and (5) hinderance of patient's rights. (*Id.* at PDF pp. 58, 192-93.)

On June 28, 2021, Plaintiff saw Dr. Ahmed of "Let's Smile Dental" to obtain a new upper partial denture because she had a crack on her spare denture that she was wearing. (SAC at PDF p. 103.) However, Dr. Ahmed was unable to supply a new denture because he was not "doing

---

[8] Based on the record before the Court, it appears that Dr. Letizia was associated with a practice named "Let's Smile Dentist" or "Let's Smile Dental." (*See*, *e.g.*, SAC at PDF pp. 102, 106.)

dentures until four months later." (*Id.*) Plaintiff scheduled an appointment for October 15, 2021.[9] (*Id.*)

On July 1, 2021, Dr. Robert Schiller, who serves as the Institute's Senior Vice President for Clinical Affairs and Chief Medical Officer, contacted Egypt by telephone to arrange for another doctor to address the issues with Teeth Nos. 12 and 15. (SAC at PDF pp. 5, 8, 69 (call log); Pl.'s 2/12/24 Opp. Mem. at 2.) Dr. Schiller told Egypt that he had investigated her concerns and that he apologized, stating that "[w]e didn't do right by you, Ms. Egypt[.]" (Pl.'s 2/12/24 Opp. Mem. at 3; SAC at PDF p. 58.) Dr. Schiller further told Egypt: "If you would give us another chance to make things right, I will assign your care to the very best doctor in our clinic." (Pl.'s 2/12/24 Opp. Mem. at 3.) Egypt agreed, thanked Dr. Schiller for reaching out and expressed that she still was experiencing pain with Teeth Nos. 12 and 15. (*Id.* at 3.) Plaintiff further stated that a root canal might be necessary to save both teeth and that she feared treatment from outside dentists because of her prior experience where they had "botched her root canals, that resulted in extractions." (*Id.*)

Dr. Schiller reassured Egypt that he would assign Dr. Leila Hagshegna, the Institute's Medical Director, to administer the dental care that Egypt needed and that he would make the necessary arrangements after a few weeks to coordinate Egypt's care. (Pl.'s 2/12/24 Opp. Mem. at 3; SAC at PDF p. 59.) Dr. Schiller told Egypt that if she needed anything that she should call him. (Pl.'s 2/12/24 Opp. Mem. at 4; SAC at PDF p. 59.)

---

[9] On October 8, 2021, "Let's Smile Dental" sent a confirmation text to Plaintiff to confirm her appointment (SAC at PDF p. 103.) When Plaintiff called to confirm her appointment, "Let's Smile Dental" told her that they could not see Plaintiff because they assumed she was being seen by another dentist after she requested her medical records. (*Id.*)

By July 13, 2021, Egypt still had not heard from Dr. Schiller or Dr. Hagshegna. (Pl.'s 2/12/24 Opp. Mem. at 4.) Because she continued to experience "intermittently sharp," but "constant throbbing pain" with Tooth No. 15, Egypt reached out to Dr. Schiller by email and phone at least eight times to get the dental treatment that Dr. Schiller promised. (*Id.*) After calling, emailing, and leaving voice messages with Dr. Schiller's secretary, Egypt alleges that "[a]ll efforts made by [her] to speak with [Dr. Schiller] were futile." (*Id.*) Egypt's "plea for help to save her teeth went unanswered." (SAC at PDF pp. 5, 59.)

On July 13, 2021, Egypt visited Dr. Letizia to address her pain in Tooth No. 15. (SAC at PDF p. 60.) Dr. Letizia took an x-ray image and stated that the tooth needed a root canal to prevent extraction. (*Id.*) However, the pre-authorization never was sent to DentaQuest for approval and no additional treatment was provided. (*Id.*)

Between July 13 and 14, 2021, Egypt called Dr. Schiller numerous times, without answer. (SAC at PDF pp. 60-63, 65-72.) At some point, Egypt connected with Dr. Schiller's assistant who said that they would relay the message to Dr. Schiller. (*Id.* at PDF p. 63.) Later in the day on July 14, 2021, Egypt had a visit with Dr. Imran Ahmed at "Let's Smile Dental." (*Id.* at PDF p. 64.) Despite Dr. Ahmed determining that the gums around Tooth No. 15 were inflamed, Dr. Ahmed allegedly "pretended" to send a prescription to the pharmacy. (*Id.*) Egypt alleges Dr. Ahmed indicated to her that, if she wanted quality care, she would "have to pay extra[,] [d]ental insurance only pays for basic care." (*Id.*)

On July 15, 2021, Plaintiff visited Atlantic Dental/East Harlem Dental where Dr. Pavel Niderman and Dr. Flora Niderman performed a partial root canal on Tooth No. 15, pending payment of the remaining balance owed to complete the full root canal. (SAC at PDF pp. 107-08.)

8

After some back and forth with respect to whether Egypt's insurance was going to authorize the procedure, the pain in Tooth No. 15 became so unbearable that Egypt went back to Dr. Pavel Niderman's office to ultimately extract Tooth No. 15 on July 28, 2021. (*Id.* at PDF p. 108.)

With respect to Tooth No. 12, at some point, it was determined that it would also need a root canal. (SAC at PDF p. 109.) On September 24, 2021, Plaintiff returned to Atlantic Dental/East Harlem Dental Plaza for the root canal and where Dr. Pavel Niderman charged Egypt a reduced-cost root canal so that his daughter, a student dentist, could practice performing a root canal procedure. (*Id.*) However, the root canal was unsuccessful because Egypt still was experiencing pain. (*Id.*) Eventually, a permanent crown was placed on Tooth No. 12 by another student dentist at NYU College of Dentistry. (*Id.*) Due to infection and later fracture, Tooth No. 12 was extracted at the Columbia University Dental Consultation and Implant Center on May 25, 2022. (*Id.* at PDF pp. 5, 15, 77-78, 181.)

## PROCEDURAL HISTORY

On March 22, 2022, Plaintiff filed an administrative tort claim (Claim No. 2022-0502) under the FTCA, alleging that employees of the Institute denied her proper dental care, services and treatment for dentures and that as a result of the substandard dental care, she suffered a loss of Teeth Nos. 12 and Tooth No. 15 and was unable to obtain new dentures. (SAC at PDF pp. 6, 98-99.) Plaintiff's claim was in the amount of $29,625.00. (*Id*. at PDF p. 98.) On January 23, 2023, Plaintiff received notice of a final determination from the United States Department of Health and Human Services ("USDHHS") that her claim was denied. (*Id*. at PDF pp. 3-4.) The notice advised Plaintiff that she could either file a written request seeking reconsideration of the final

determination within six months, or file suit against the United States in the appropriate federal district court. (*Id.*)

On April 7, 2023, Plaintiff filed her Complaint in this action, and filed an Amended Complaint three days later. (*See* Compl., ECF No. 1; Am. Compl., ECF No. 4.) In her Complaint and Amended Complaint, Plaintiff had named as defendants the Institute and the "U.S. Department of Health and Human Services Office of the General Counsel." (Compl. at PDF p. 1; Am. Compl. at PDF p. 1.) On June 12, 2023, the Court entered an Order of Dismissal stating, in part, that "the proper defendant for Plaintiff's FTCA claims arising from services provided by the Institute and its employees is the United States," and granting Plaintiff leave to file a second amended complaint. (Order of Dismissal, ECF No. 5, at 6, 8.)

On July 10, 2023, Plaintiff filed her SAC naming "The United States of America" as the only defendant. (SAC at PDF p. 1.) In the SAC, Plaintiff asserts an FTCA claim and seeks $250,000.00 in damages. (*Id.* at PDF pp. 1, 9.)

On January 5, 2024, the Government filed the instant motion to dismiss and its supporting papers. (*See* Def.'s 1/5/24 Mot. to Dismiss; Def.'s 1/5/24 Mem., ECF No. 26; Atsaves Decl., ECF No. 27.) On February 12, 2024, Plaintiff filed her opposition to the Government's motion. (Pl.'s 2/12/24 Opp. Mem.) On March 5, 2024, the Government filed its reply. (Def.'s 3/5/24 Reply, ECF No. 34.)

## DISCUSSION

The Court liberally construes the SAC to assert a medical malpractice claim arising out of the December 23, 2020 visit with Dr. Tirsun; a negligent supervision claim for Dr. Sherman's failure to supervise Dr. Tirsun; a negligent supervision claim for the Institute's failure to supervise

the care provided by Mount Sinai; negligence/malpractice claims based on the abandonment of Plaintiff by the Institute, Dr. Atsaves and Dr. Schiller;[10] and a breach of contract claim for the Institute's providers alleged various breaches of an implied contract. (*See generally* SAC.) The Government moves to dismiss certain claims (addressed in Discussion Section I, *infra*), pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction, and moves to dismiss the remaining claims, pursuant to Rule 12(b)(6), for failure to state a claim.

**I.**     **Motion To Dismiss For Lack Of Subject Matter Jurisdiction**

The Government argues that the Court lacks subject matter jurisdiction with respect to the following of  Plaintiff's claims: (1) claims premised on the conduct of Dr. Tirsun and Dr. Sherman, because they were independent contractors and the Government has not waived sovereign immunity for claims based on their conduct; (2) the claim premised on the Institute's failure to supervise the care provided by Mount Sinai, because the supervision of care falls under the FTCA's discretionary function exception and, for acts that fall under this exception, the Government has not waived its sovereign immunity; and (3) the breach of contract claim because it is in excess of the jurisdiction conferred in the Tucker Act. (Def.'s 1/5/24 Mem. at 8-17.) After setting forth the relevant legal standards, the Court considers each of these arguments, in turn.

---

[10] Both the Government and Plaintiff characterize the claims based upon the conduct of the Institute, Dr. Atsaves and Dr. Schiller as a claim for "patient abandonment." (*See, e.g.*, Def.'s 1/5/24 Mem. at 17; Pl.'s 2/12/24 Opp. Mem. at 5.) Under New York law, "[i]t is well established that a doctor who undertakes to examine and treat a patient (thus creating a doctor-patient relationship) and then abandons the patient may be held liable for medical malpractice." *Cregan v. Sachs*, 65 A.D.3d 101, 111 (2d Dep't 2009) (quoting *Lewis v. Capalbo*, 280 A.D.2d 257, 258 (1st Dep't 2001)). Because an action to recover for personal injuries against a medical practitioner or a medical facility may be based either on negligence principles or on the more particularized medical malpractice standard (*see* Discussion Section II.A.2., *infra*), the Court refers to the claims based upon patient abandonment as negligence/medical malpractice claims.

### A.    Legal Standards

#### 1.    Rule 12(b)(1)

A defendant may move to dismiss a claim for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). A case may be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In considering a motion under Rule 12(b)(1), the Court "'must accept as true all material factual allegations in the complaint' and should refrain from drawing argumentative inferences in favor of the party contesting jurisdiction." *Dickerson v. Mut. of Am.*, 703 F. Supp. 2d 283, 289 (S.D.N.Y. 2010) (quoting *Atlantic Mut. Ins. Co. v. Balfour Macclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992)). "However, the Court is not confined to the allegations in the Complaint," when resolving a motion to dismiss for lack of subject matter jurisdiction, *id.*, and "may refer to evidence outside the pleadings," *Makarova*, 201 F.3d at 113 (citing *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)), including "affidavits and other materials beyond the pleadings to resolve the jurisdictional question." *Lehman v. Discovery Commc'n*, 217 F. Supp. 2d 342, 346 (E.D.N.Y. 2002) (citations omitted).

#### 2.    Sovereign Immunity And Relevant Federal Statutes

The Government, as sovereign, is generally immune from suit unless Congress has expressly waived that immunity. *See United States v. Mitchell*, 463 U.S. 206, 212 (1983); *United States v. Testan*, 424 U.S. 392, 399 (1976). "The doctrine of sovereign immunity is jurisdictional in nature, and therefore to prevail, the plaintiff bears the burden of establishing that her claims fall within an applicable waiver." *Nkansah v. United States*, No. 18-CV-10230 (PAC), 2020 WL

1435178, at *3 (S.D.N.Y. Mar. 24, 2020) (quoting *Makarova*, 201 F.3d at 113; *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 120 (2d Cir. 2017)) (internal citations omitted). The FTCA provides a limited waiver of sovereign immunity, allowing suits against the federal government for torts committed by an "employee of the Government while acting within the scope of his office or employment . . . ." 28 U.S.C. § 1346(b)(1). Under the FTCA, excluded from the definition of "employee of the government" is "any contractor with the United States." 28 U.S.C. § 2671. "Thus, as a general rule, sovereign immunity precludes suits against the United States for injuries caused by its independent contractors." *Roditis v. United States*, 122 F.3d 108, 111 (2d Cir. 1997) (per curiam); *see United States v. Orleans*, 425 U.S. 807, 814 (1976); *Fisko v. U.S. Gen. Servs. Admin.*, 395 F. Supp. 2d 57, 62 (S.D.N.Y. 2005).

The Federally Supported Health Centers Assistance Act ("FSHCAA"), 42 U.S.C. § 233(a), "makes the [FTCA] the exclusive remedy for specified actions against members of the Public Health Service," *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000), and deems "health centers" that receive funding under the Public Health Service Act, 42 U.S.C. §254b, to be "Public Health Service employees" for purposes of the FTCA. *See* 42 U.S.C. § 233(g)(1)(A). The FSHCAA extends FTCA malpractice coverage to "torts by employees of such health centers, as well as by physicians who directly contract with the health center" by defining a Public Health Service employee to include "any officer, governing board member, or employee of [a covered] entity, and any contractor of [a covered] entity who is a physician or other licensed or certified health care practitioner." 42 U.S.C. § 233(g)(1)(A)(4); *Hersko v. United States*, No. 13-CV-03255 (MHD), 2015 WL 6437561, at *15 (S.D.N.Y. Oct. 20, 2015) (citing 42 U.S.C. § 233(g)(1)(A)). The FSHCAA "does not, however, waive Government immunity from liability for torts committed by *entities* that

contract with a federally-funded health center, nor does it waive immunity for torts by employees of such entities." *Id.* (emphasis supplied); *see Fan ex rel. Zu Hua Chen v. United States,* No. 04-CV-09540 (RPP), 2007 WL 10323304, at *13 (S.D.N.Y. Apr. 3, 2007); *accord Rosenblatt v. St. John's Episcopal Hosp.*, No. 11-CV-1106 (ERK) (CLP), 2012 WL 294518, at *5 (E.D.N.Y. Jan. 31, 2012).

The Tucker Act, codified at 28 U.S.C. § 1491, provides the United States Court of Claims exclusive jurisdiction for contractual claims against the United States, which exceed $10,000.00, such that said claims "cannot be heard in federal district courts." *Jain v. Brennan*, No. 18-CV-04446 (PAE) (SDA), 2019 WL 2451291, at *5 (S.D.N.Y. Apr. 25, 2019) (quoting *Chu v. Schweiker*, 690 F.2d 330, 334 (2d Cir. 1982)), *report & recommendation adopted*, 2019 WL 2992173 (S.D.N.Y. July 9, 2019).

    **B.**    <u>**Analysis**</u>

        **1.**    <u>**The Court Lacks Subject Matter Jurisdiction Over Claims Premised On The Conduct Of Mount Sinai Employees**</u>

Plaintiff alleges that Dr. Tirsun, a Mount Sinai resident dentist at the Institute Clinic, was negligent when she failed to take x-rays of Tooth No. 12 and Tooth No. 15 after Plaintiff complained of pain during her December 23, 2020 visit to the Institute Clinic and that Dr. Sherman, the attending physician who oversaw the visit, negligently failed to supervise Dr. Tirsun. (*See* SAC at 6-7, 53.) In order for Plaintiff to hold the Government liable for the actions of Dr. Tirsun and Dr. Sherman, each must either be a "government employee" within the meaning of the FTCA or a "Public Health Service Employee" within the meaning of the FSHCAA, which extends malpractice coverage under the FTCA to employees of covered health centers. The Government argues that Plaintiff's claims, premised on the conduct of Dr. Tirsun and Dr. Sherman, should be

dismissed because they were independent contractors[11] and not employees within the meaning of either statute. (*See* Def.'s 1/5/24 Mem. at 8-13.)

The Institute has been eligible for malpractice liability protection under the FTCA and the FSHCAA since March 1, 2002. (Atsaves Decl., ECF No. 27, ¶ 3.[12]) Since 2013, the Institute has had a contractual relationship pursuant to a Residency Rotation Agreement (the "RRA") with Mount Sinai Hospital and the Icahn School of Medicine at Mount Sinai (collectively "Mount Sinai") wherein Mount Sinai agreed to provide attending and resident dentists on a regular basis to provide dental care to patients of the Institute. (Atsaves Decl. ¶ 5; Atsaves Decl., Ex. 1, RRA ("RRA"), ECF No. 27-1.) The RRA explicitly provided that Mount Sinai attending and resident dentists were "at all times" to be considered "independent contractors and not employees or agents of [the Institute], and [should] not hold . . . themselves out as employees or agents of [the Institute]." (RRA at 8, ¶ 28.) The RRA also provides as follows:

> Nothing in this Agreement is intended, nor shall be construed, to create an employer/employee relationship, a joint venture relationship or an agency relationship or to allow [the Institute] to exercise control or direction over the manner or method by which Mount Sinai performs any professional services which are the subject of this Agreement.

---

[11] By contrast, Dr. Atsaves, who served as the Institute Director of the Institute Clinic, and Dr. Schiller, who served as the Institute Senior Vice President for Clinical Affairs and Chief Medical Officer (*see* SAC at PDF p. 58, 104), are considered federal Public Health Service employees under § 233(g)(4) of the FSCHAA, which defines a federal Public Health Service employee as "any entity receiving Federal funds under [42 U.S.C. § 254b]" and "any officer, governing board member, or employee of such entity, and any contractor of such an entity who is a physician or other licensed or certified health care practitioner." 42 U.S.C. § 233(g)(1)(A)(4).

[12] The Court considers the Atsaves Declaration for purposes of assessing Defendant's motion to dismiss pursuant to Rule 12(b)(1), as it is permitted to do. *See Aiello v. Kellogg, Brown & Root Svcs., Inc.*, 751 F. Supp. 2d 698, 702 (S.D.N.Y. Mar. 31, 2011) (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (noting that while standards for a motion to dismiss pursuant to Rule 12(b)(1) an Rule 12(b)(6) are substantively the same, "'[i]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside the pleadings.'").

(*Id.*)

Despite providing medical dental services at the Institute, none of the resident or attending dentists under the RRA were paid compensation or provided benefits by the Institute, and Mount Sinai retained full control over the dental residency rotation program. (Atsaves Decl. ¶¶ 8-9; RRA at 2, ¶¶ 1-2.) Mount Sinai resident dentists only were supervised by Mount Sinai attending dentists, all of whom were supervised by the Mount Sinai Residency Program Director. (Atsaves Decl. ¶ 10; RRA at 4, ¶ 6.) If a Mount Sinai resident (or attending) dentist violated any policies of Mount Sinai or the Institute, or committed any other action that warranted discipline, Mount Sinai remained responsible for "investigating such issues and [had] the right to use its own disciplinary procedures, including applicable grievance procedures." (RRA. at 2, ¶ 3.) The Institute's dentists "did not, and were not required to, manage, supervise, inspect, or approve the dental care provided by Mount Sinai residents or attending dentists." (Atsaves Decl. ¶ 10.)

Dr. Tirsun was a Mount Sinai resident and Dr. Sherman, who supervised Dr. Tirsun, was a Mount Sinai attending dentist. (Atsaves Decl. ¶ 7.) The care they provided to Plaintiff was pursuant to the RRA. (*Id.*) Neither of them had any direct contractual relationship with the Institute. (*Id.*) Because Dr. Tirsun and Dr. Sherman were employed by Mount Sinai, and not by the Institute, they do not meet the FSHCAA definition of a covered contract employee. *See* 42 U.S.C. § 233(g)(1)(A); *see Fan ex rel. Zu Hua Chen v. United States*, No. 04-CV-09540 (RPP), 2007 WL 1032304, at *13 (S.D.N.Y. Apr. 3, 2007) ("Under the plain language of § 233(g)(1)(A), the term 'contractor of such an entity who is a physician' is limited to individual physicians who contract with the entity."); *see also Hersko*, 2015 WL 6437561, at *15 ("FTCA covers torts by employees

of [federal] health centers, as well as by physicians who directly contract with the health center.")
(citing 42 U.S.C. § 233(g)(1)(A)).

The question remains, however, whether Dr. Tirsun and Dr. Sherman were "government
employees" of the Institute, or independent contractors, within the meaning of the FTCA. The
FTCA defines "employee[s] of the government" to include "officers or employees of any federal
agency . . . and persons acting on behalf of a federal agency in an official capacity," but excludes
"any contractor with the United States." 28 U.S.C. § 2671. Whether an individual is a government
employee for purposes of the FTCA is governed by the "strict control test." *Rosenblatt*, 2012 WL
294518, at *5 (citing *Logue v. United States,* 412 U.S. 521, 528 (1973)). Under the strict control
test, "courts look to whether the Government controlled the detailed physical performance of
the contractor or supervised its day-to-day operations." *Esgrance v. United States*, No. 17-CV-
08352 (JPO), 2018 WL 2943222, at *2 (S.D.N.Y. June 11, 2018) (citing *Roditis v. United States*, 122
F.3d 108, 111 (2d Cir. 1997)). "The question is appropriately resolved by looking at the language
of the contract between the Government and the contracting entity, in order to determine
whether the contract provides for detailed day-to-day supervision of the contractor's physical
performance, or rather grants the contractor autonomy in the performance of his work." *Id.*
(quoting *Korotkova v. United States*, 990 F. Supp. 2d 324, 328 (E.D.N.Y. 2014)).

"The circuits have consistently held that physicians either in private practice or associated
with an organization under contract to provide medical services to facilities operated by the
federal government are independent contractors, and not employees of the government for
FTCA purposes." *Fan*, 2007 WL 1032304, at *13 (quoting *Robb v. United States*, 80 F.3d 884, 890
(4th Cir. 1996)) (holding that resident physician was not employee of FQHC because she was

employee of NYU, not directly compensated by FQHC, and MOU did not grant health center authority to control detailed performance of NYU physicians); *Hersko*, 2015 WL 6437561, at *15 (plaintiff failed to show that physicians were effectively converted into federal employees where there was no evidence that FQHC exerted direct control over how contracting entity and its physicians performed their medical functions).

Here, Dr. Tirsun and Dr. Sherman were Mount Sinai employees assigned to work at the Institute pursuant to the RRA between Mount Sinai and the Institute. (Atsaves Decl. ¶ 7; RRA at 8, ¶ 28.) The RRA did not grant the Institute the authority to determine the manner of Mount Sinai's performance of the contract, or to supervise Mount Sinai's day-to-day operations. (RRA at 8, ¶ 28.) The RRA expressly stated that Mount Sinai attending dentists and residents were independent contractors and not employees or agents of the Institute. (*Id.*) Dr. Tirsun and Dr. Sherman received no compensation or employment benefits directly from the Institute.[13] (Atsaves Decl. ¶ 8; RRA at 2, ¶¶ 1-2.)

In view of the foregoing, the Court finds that Dr. Tirsun and Dr. Sherman were independent contractors and not federal employees under the FTCA. As such, the Government cannot be liable for their conduct and the claims premised on their conduct should be dismissed for lack of subject matter jurisdiction. *See Fisko*, 395 F. Supp. 2d at 62.

---

[13] Mount Sinai assumed sole responsibility for "the costs of employing Residents (including salaries and fringe benefits . . .) when Residents rotate to the [the Institute] Clinic" (RRA at 2, ¶ 1) and for the "payment of compensation of Mount Sinai Attending Dentists" (*Id.* at 2, ¶ 2.)

2.      **The Court Lacks Subject Matter Jurisdiction Over The Claim Premised On The Institute's Failure To Supervise The Care Provided By Mount Sinai**

The SAC also alleges that the Institute negligently failed to supervise the care provided by Mount Sinai. (*See* SAC at PDF p. 5.) The Government asserts that "the discretionary function exception to the FTCA contained in 28 U.S.C. § 2680(a) bars any claim of negligent supervision in contractual relationships like the one that existed between [the Institute] and Mount Sinai." (Def.'s 1/5/24 Mem. at 13.) The Court agrees.

The FTCA's discretionary function exception precludes claims against the Government "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see Molchatsky v. United States*, 778 F. Supp. 2d 421, 430 (S.D.N.Y. 2011) (citing 28 U.S.C. § 2680(a)). The purpose of the discretionary function exception is "to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (internal quotation marks and citation omitted).

The Supreme Court has established a two-prong test to determine whether the discretionary function exception applies. The first question is whether the alleged negligent conduct violated a mandatory regulation or whether it involved "an element of judgment or choice." *Fan*, 2007 WL 1032304, at *15 (quoting *Gaubert*, 499 U.S. at 324-25). "If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *Gaubert*, 499 U.S. at 324. "Otherwise, the inquiry continues to the second prong, which asks whether 'the action challenged . . . involve[d]

the permissible exercise of policy judgment.'" *Fan*, 2007 WL 1032304, at *15 (quoting *Berkovitz v. United States*, 486 U.S. 531, 537 (1963)).

If "a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Gaubert*, 499 U.S. at 324. Thus, "[w]hen established governmental policy, as expressed or implied by statute, regulation or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.*

The FSCHAA defines a "health center" as "an entity that serves a population that is medically underserved, . . . by providing, either through the staff and supporting resources of the center *or through contracts or cooperative arrangements* . . . required primary health services." 42 U.S.C. § 254b(a) (emphasis supplied). It is not disputed that the Institute is a federally-funded community health center, which, itself, is deemed a federal employee under the FTCA and FSHCAA. (Atsaves Decl. ¶ 3.) "Primary health services" are defined to include "basic health services which, for purposes of this section, shall consist of . . . preventive dental services." 42 U.S.C. § 254b(b)(1)(A)(i)(III)(hh). Thus, under § 254b(a) of the FSHCAA, the Institute has the discretion to provide preventive dental services, including services furnished by physicians "through contracts or cooperative agreements." The Institute exercised this discretion pursuant to the RRA with Mount Sinai.

"Courts have repeatedly held that the selection and supervision of contractors is a discretionary function." *Fan*, 2007 WL 1032304, at *6, 16 (quoting *Carter v. United States*, No.

96-CV-09139 (MBM), 1998 WL 744009 at *4 (S.D.N.Y. Oct. 26, 1998)) (dismissing negligent supervision claim based on FQHC's discretion to contract for medical services and supervision under 42 U.S.C. § 254b); *see also Nin v. Liao*, No. 02-CV-08308 (JCF), 2004 WL 2848520, at *4 (S.D.N.Y. Dec. 9, 2004) ("[d]etermining the method and extent of supervision constitutes an exercise of discretionary authority").

Through the RRA, the Institute made the policy decision, as permitted under 42 U.S.C. § 254b(b)(1)(A)(i)(III)(hh), to contract-out preventive dental services, as well as supervision of those services, to Mount Sinai. (RRA at 1.) The RRA thus captures the alleged negligent conduct that forms the basis of Plaintiff's negligent supervision claim (*i.e.*, the Institute's delegation of supervisory duties to Mount Sinai attending and resident physicians). Moreover, as Dr. Atsaves attested, she did "not oversee Mount Sinai dental residents or attending dentists[]" and "Mount Sinai residents were only supervised by Mount Sinai attending dentists." (Atsaves Decl. at ¶¶ 1, 10.) The Institute's dentists "did not, and were not required to, manage, supervise, inspect, or approve the dental care provided by Mount Sinai residents or attending dentists." (*Id.* ¶ 10.) As a result, Plaintiff's negligent supervision claim against the Government for the Institute's delegation is barred by the discretionary function exception, and should be dismissed for lack of subject matter jurisdiction. *See Cangemi v. United States*, 13 F.4th 115, 130 (2d Cir. 2021) ("[F]or acts that fall under the discretionary function exception, the United States has not waived its sovereign immunity, and federal courts lack subject matter jurisdiction over claims premised on those acts.").

    **3.**    **The Court Lacks Subject Matter Jurisdiction Over Plaintiff's Breach Of Contract Claim**

Plaintiff asserts a breach of contract claim against the Government arising from the alleged breach of an "implied-in-fact financial contract" entered in 2012 between herself and the Institute. (*See* SAC at PDF p. 9.) Egypt alleges that the Institute failed to perform its portion of the "implied-in-fact financial contract" by not adhering to its mission statement and promise of "high quality" care. (*Id.* at PDF p. 15.) The Government moves to dismiss Plaintiff's claim on the ground that this Court lacks jurisdiction over the breach of contract claim and that, even if the Court had jurisdiction, Plaintiff's breach of contract claim should be dismissed based upon principles of New York law. (Def.'s 1/5/24 Mem. at 15-17.)

The Court agrees with the Government that the Court lacks subject matter jurisdiction over Plaintiff's breach of contract claim, given the amount of damages sought by Plaintiff. The Tucker Act, codified at 28 U.S.C. § 1491, provides the United States Court of Claims exclusive jurisdiction for contractual claims against the United States, which exceed $10,000.00, such that said claims "cannot be heard in federal district courts." *Jain*, 2019 WL 2451291, at *5 (quoting *Chu v. Schweiker*, 690 F.2d 330, 334 (2d Cir. 1982)). In the present case, Plaintiff seeks $250,000.00 in damages.[14] (SAC at PDF p. 9.)

---

[14] The Government argues that $29,625.00 is Plaintiff's damages cap in this action, since that is the amount that Plaintiff sought in the claim presented to the USDHHS. (*See* Def.'s 1/5/24 Mem. at 15.) The Government is correct that a personal injury action under the FTCA may "not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." 28 U.S.C. § 2675(b). That provision of the FTCA, however, is not applicable to a breach of contract claim. *See* 28 U.S.C. § 2675(a) (statute applies to "a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment").

"Because 'the plaintiff asserting subject matter jurisdiction has the burden of proving that it exists by a preponderance of the evidence,' the plaintiff must establish that the claims asserted are below the monetary threshold [in the Tucker Act].'" *Mohamed v. Fed. Bureau of Investigations*, No. 14-CV-07615 (CM), 2015 WL 6437369, at *4 (S.D.N.Y. Oct. 21, 2015) (quoting *Czetwertynski v. United States*, 514 F. Supp. 2d 592, 594 (S.D.N.Y. 2007)) (cleaned up). Since Plaintiff seeks $250,000.00 in damages, which exceeds the threshold for this Court to maintain subject matter jurisdiction, her breach of contract claim must be dismissed, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See id.* at *4 (dismissing contract claims without prejudice with leave to refile in United States Court of Federal Claims "[b]ecause [plaintiff] has not established that this court has jurisdiction over his contract claims, [the relevant counts] must be dismissed").[15]

## II.   **Defendant's Motion To Dismiss For Failure To State A Claim**

As set forth above, the Court liberally construes the SAC as asserting negligence/medical malpractice claims based upon the conduct of Dr. Atsaves, Dr. Schiller and the Institute. Specifically, Plaintiff alleges that Dr. Atsaves abandoned Plaintiff by releasing her to an inexperienced, uncaring and biased resident [*i.e.*, Mount Sinai Resident Dentist Dr. Tirsun] (Pl.'s 2/12/24 Opp. Mem. at 7); that, for seven months, the Institute never contacted her to schedule

---

[15] Because the Court lacks subject matter jurisdiction over Plaintiff's breach of contract claim, it need not and does not reach the issue of whether Plaintiff has stated a breach of contract claim against the Government, except to note that the Government's reliance on New York law is misplaced because "federal law [applies] to questions directly involving the [contractual] rights and duties of the Federal Government." *Authentic Apparel Grp., LLC v. United States*, 123 Fed. Cl. 92, 96 (2015), *aff'd*, 989 F.3d 1008 (Fed. Cir. 2021) (quoting *Miree v. DeKalb Cnty.*, 433 U.S. 25, 31 (1977)); *see also id*. ("In the context of contracts between the federal government and its citizens, the courts have opted for a uniform federal common law of contracts as the federal rule of decision, to avoid the uncertainty of conflicting state laws." (quoting *Price v. United States*, 46 Fed. Cl. 640, 646 (2000)).

a follow-up examination and only offered her a cleaning (SAC at PDF p. 5);[16] and that Dr. Schiller reached out to Plaintiff regarding treatment, but then did not follow up and delayed her treatment. (*Id*.) Egypt alleges a breach of a "legal duty to treat [her] for tooth/teeth pain." (*Id.* at PDF p. 8.) The Government contends that Plaintiff fails to state a claim for what it refers to as "patient abandonment." (Def.'s 1/5/24 Mem. at 17-22.)

A. **Legal Standards**

1. **Rule 12(b)(6)**

A defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding a motion to dismiss, the Court "must accept as true all of the factual allegations contained in a complaint[,]" but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted); *see also Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 239 (S.D.N.Y. 2019) ("The Court need not accept as true, 'legal conclusions, deductions, or opinions couched as factual allegations.'") (quoting *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007)). Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Determining whether a complaint states a plausible claim . . . [is] a context-specific

---

[16] Per the RRA, the Institute was responsible for scheduling. (*See* RRA at 5, ¶ 11; *id.* at 11.)

task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). In other words, the Court "tests the legal sufficiency of a plaintiff's claim for relief." *Manolov v. Borough of Manhattan Cmty. Coll.*, 952 F. Supp. 2d 522, 531 (S.D.N.Y. 2013).

When plaintiffs proceed *pro se*, "the Court must read [their] pleadings 'liberally' and interpret them 'to raise the strongest arguments' that they may suggest." *Manolov*, 952 F. Supp. 2d at 531. (quoting *Chavis v. Cappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citing *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010))). Generally, the Court "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Mail Am. Commc'n, Inc. v. World Healing Ctr. Church, Inc.*, No. 18-CV-08481 (DAB) (SDA), 2019 WL 8017846, at *5 (S.D.N.Y. Dec. 17, 2019) (citation and internal quotation omitted), *report & recommendation adopted*, 2020 WL 883043 (S.D.N.Y. Feb. 24, 2020). "In evaluating the legal sufficiency of a *pro se* plaintiff's claims, a court may rely on the plaintiff's opposition papers." *Vlad-Berindan*, 2014 WL 6982929, at *6 (citing cases).

### 2.      Medical Malpractice And Negligence Under New York Law

"[T]he FTCA directs courts to consult state law to determine whether the government is liable for the torts of its employees." *Liranzo v. United States*, 690 F.3d 78, 86 (2d Cir. 2012) (citations omitted). "In New York, '[a]n action to recover for personal injuries . . . against a medical practitioner or a medical facility or hospital may be based either on negligence principles or on the more particularized medical malpractice standard." *Razzoli v. Richmond Univ. Med. Ctr.*, No. 23-CV-06697 (AMD) (LB), 2023 WL 7017105, at *2 (E.D.N.Y. Oct. 25, 2023) (quoting *Kushner v.*

*Schervier Nursing Care Ctr.*, No. 05-CV-05297 (DAB), 2011 WL 1201936, at *9-10 (S.D.N.Y. Mar. 23, 2011)). "The distinction between these kinds of claims is a subtle one, for medical malpractice is but a species of negligence and no rigid analytical line separates the two." *Id.* (quoting *Weiner v. Lenox Hill Hosp.*, 88 N.Y.2d 784, 787 (1996)) (internal quotation marks omitted). "A claim sounds in medical malpractice when the challenged conduct 'constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician.'" *Id.* (quoting *Sha v. Mem'l Sloan-Kettering Cancer Ctr.*, No. 99-CV-03233 (AKH), 2000 WL 1760883, at *2 (S.D.N.Y. Nov. 29, 2000)). A claim "sounds in negligence when 'the provider failed to fulfill a different duty.'" *Id.* (quoting *Gjini v. United States*, No. 16-CV-03707 (KMK), 2019 WL 498350, at *25 (S.D.N.Y. Feb. 8, 2019)). In either case, a plaintiff must demonstrate that the deviation or departure from accepted practice, or other breach of duty, was the proximate cause of her injury or damage. *See Rivera v. Fed. Bureau of Prisons*, No. 17-CV-05103 (GBD) (DF), 2018 WL 11312146, at *10 (S.D.N.Y. Dec. 14, 2018), *report & recommendation adopted*, 368 F. Supp. 3d 741 (S.D.N.Y. 2019) (comparing standards).[17]

"Proximate cause" exists "where the alleged negligence is a 'substantial factor' in or 'substantial cause' of the injury." *Phillips ex rel. Green v. City of New York*, 453 F. Supp. 2d 690, 742 (S.D.N.Y. Sept. 25, 2006) (citations omitted). Under New York law, "[a]n intervening act by a third party does not necessarily break the causal connection between the defendant's negligence and a plaintiff's injury." *Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 395 (E.D.N.Y. 2004) (citing

---

[17] Because the Government argues for dismissal solely based on proximate cause, the Court need not definitively characterize Plaintiff's tort claims as sounding in negligence or medical malpractice. As the *Rivera* court notes, disputes regarding the governing standard typically arise when the shorter statute of limitations applicable to medical malpractice claims has run, *see Rivera*, 2018 WL 11312146, at *10 n.9, which is not an issue here.

*Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315 (1980)). "To break the legal chain, the intervening act must have been 'of such an extraordinary nature or so attenuated from the defendants' conduct that responsibility for the injury should not reasonably be attributed to them.'" *Id*. (quoting *Gordon v. Eastern Ry. Supply, Inc*., 82 N.Y.2d 555, 562 (1993)).

    **B.**    **Analysis**

The sole basis asserted by the Government in its moving memorandum in support of dismissal of Plaintiff's negligence/medical malpractice claims is that, according to the Government, Plaintiff has not plausibly alleged proximate causation. (*See* 1/5/24 Mem. at 17-22.) The Government urges the Court "to assess at this [motion to dismiss] stage [of the case] whether Plaintiff has sufficiently alleged that any 'abandonment' by [the Institute] was a proximate cause of her injuries" (*id*. at 18), and argues that the "series of intervening events as related in the [SAC] severed any possible causal nexus between any 'abandonment' by [the Institute] in December 2020 and the dental injuries she suffered from July 2021 to May 2022." (*Id*. at 20.)

Plaintiff alleges that, after she was "abandoned" by Dr. Atsaves, she was treated by a resident dentist, Dr. Tirsun, who she alleges was "inexperienced, uncaring and biased." (Pl.'s 2/12/24 Opp. Mem. at 7.) The Court agrees with the Government that Plaintiff has not plausibly alleged that any of her injuries were proximately caused by Dr. Atsaves's so-called abandonment. Dr. Atsaves last treated Plaintiff on July 9, 2020. (SAC at PDF p. 51.) Her next appointment at the Institute was with Dr. Tirsun on December 23, 2020. (*Id*. at 52-53.) Plaintiff alleges that, at this appointment, Dr. Tirsun, "acting under the guidance of her superiors at the [Institute Clinic], acted negligently . . . ." (*Id*. at 6.) The attending dentist who supervised Dr. Tirsun at the December

23, 2020 visit was Dr. Sherman,[18] not Dr. Atsaves. (*See* SAC at 6-7, 53.) Thus, Dr. Atsaves cannot be held responsible for any harm that stemmed from Plaintiff's visit with Dr. Tirsun.

The Court also agrees with the Government that, to the extent Plaintiff seeks to recover for injuries due to botched root canals and other treatment that ultimately led to tooth extractions, she has not plausibly alleged that those injuries were proximately caused by her alleged abandonment by the Institute, Dr. Atsaves or Dr. Schiller. (*See* Def.'s 1/5/24 Mem. at 9-21.) Rather, those injuries stemmed from later care she received from other providers outside of the Institute. (SAC at PDF pp. 5, 15, 59-60, 77-78, 103, 181; Pl.'s 2/12/24 Opp. Mem. at 3, 7.) Thus, there was a break in the causal chain. *See Pierre v. Lieber*, 37 A.D.3d 572, 573 (2d Dep't 2007) (finding that physician's failure to diagnose gestational diabetes was not proximate cause of plaintiff's injuries where "the actions taken by the other defendants in an attempt to alleviate [fetal] distress were independent and far removed from the appellant's conduct, and were thus superseding acts which broke the causal nexus").

However, Plaintiff plausibly has alleged that she experienced pain and suffering proximately caused by the Institute and Dr. Schiller's failure to follow-up with her in a timely manner, which resulted in delays in her treatment. (SAC at PDF p. 8.) For example, in July 2021, Plaintiff advised Dr. Schiller and the Institute of the pain she was experiencing in, and other issues she was encountering with, Tooth Nos. 12 and 15 and she requested treatment to alleviate her conditions, to no avail. (*See, e.g.*, Pl.'s 2/12/24 Opp. Mem. at 3.) While the Government correctly maintains that post-December 2020 intervening acts during treatment by other providers broke

---

[18] As set forth above, the Court lacks subject matter jurisdiction with respect to claims arising out of the conduct of Dr. Tirsun and Dr. Sherman. *See* Discussion Section I.B.1, *supra*.

the chain of causation relating to the Institute and Dr. Schiller, Plaintiff plausibly has alleged injury (*e.g.*, pain and suffering) stemming from delays prior to that treatment—*i.e.*, during the at least seven months between her December 2020 appointment with Dr. Tirsun and her first treatment with Atlantic Dental. *See Hughes v. New York Hosp.-Cornell Med. Ctr.*, 195 A.D.2d 442, 443 (2d Dep't 1993) (ordering new trial with respect to allegation that doctor's delay in testing or reference to another physician constituted medical malpractice and resulted in suffering).[19]

Thus, the Court finds that it would be inappropriate to dismiss on causation grounds Plaintiff's negligence/medical malpractice claims, pursuant to Rule 12(b)(6), premised on the delay by Institute and Dr. Schiller in providing treatment. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189 n.21 (2d Cir. 2015) ("questions of causation are often complex, and where the issue is the chain of causation, that issue is not appropriate for resolution on a motion to dismiss"). For these reasons, it is respectfully recommended that the Government's motion to dismiss Plaintiff's negligence/medical malpractice claims premised on the conduct of the Institute and Dr. Schiller be denied.

### III.   Limited Leave To Amend

In her opposition memorandum, Plaintiff requests that she be granted leave to amend to address "any deficiencies identified by the Court." (Pl.'s 2/12/24 Opp. Mem. at 1.) "It is the usual practice upon granting a motion to dismiss to allow leave to replead." *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). Indeed, Rule 15 of the Federal Rules of Civil

---

[19] Courts in New York have recognized that causation, especially in the dental malpractice context, does not require the Plaintiff to "eliminate every other possible cause" of her aggrieved pain for the case to eventually proceed before a jury. *Pasquale v. Miller*, 194 A.D.2d 597, 598 (2d Dep't 1993) (citations omitted).

Procedure provides that the "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). "This relaxed standard applies with particular force to *pro se* litigants." *Pangburn v. Culbertson*, 200 F.3d 65, 70 (2d Cir. 1999).

"'[A] *pro se* complaint is to be read liberally,' and should not be dismissed without granting leave to amend at least once when such a reading 'gives *any* indication that a valid claim *might* be stated.'" *Pangburn*, 200 F.3d at 70 (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (per curiam) (emphasis in original)). However, "[l]eave to amend may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *United States v. Carranza*, No. 20-CV-05396 (GHW), 2023 WL 2263119, at *8 (S.D.N.Y. Feb. 28, 2023) (quoting *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (internal citations omitted)). "While 'futility' is a valid reason for denying a motion to amend, *John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994), this is true only where it is 'beyond doubt that the plaintiff can prove no set of facts in support' of [her] amended claims." *Pangburn*, 200 F.3d at 70-71 (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (internal quotation marks omitted)).

The Court finds that Plaintiff should be granted leave to amend her breach of contract claim, should she choose to do so. There is a federal statute known as the "Little Tucker Act," codified at 28 U.S.C. § 1346, which confers original and "concurrent jurisdiction upon district courts [with respect to a breach of contract claim against the Government] when the amount of the damage claim is $10,000 or less." *Adeleke v. United States*, 355 F.3d 144, 152 (2d Cir. 2004) (citing 28 U.S.C. § 1346(a)(2)). Thus, if Plaintiff would like to pursue her breach of contract claim

in this Court, she could amend her pleading so as to abandon any claim for monetary relief in excess of $10,000.00. If Plaintiff chooses to do so, this Court would have subject matter jurisdiction over Plaintiff's breach of contract claim. *See Jain*, 2019 WL 2451291, at *6 (recommending dismissal of pleading alleging breach of contract claim against Government seeking in excess of $10,000.00 in damages, with leave to amend "to clearly and expressly waive all claims to monetary relief in excess of $ 10,000," so as to fit within Little Tucker Act).[20]

However, it would be futile for Plaintiff to amend her claims premised on the conduct of Mount Sinai employees and her claims premised on the Institute's failure to supervise the care provided by Mount Sinai, because the Court lacks subject matter jurisdiction over such claims. (*See* Discussion Sections I.B.1 and I.B.2, *supra*.) It also would be futile for Plaintiff to amend her claims premised on the alleged abandonment of Plaintiff by Dr. Atsaves because, for reasons previously articulated, Dr. Tirsun provided to Plaintiff the allegedly negligent treatment that occurred on December 23, 2020, and Dr. Atsaves did not supervise that treatment. (*See* Discussion Section II.B, *supra*.) Finally, it would be futile for Plaintiff to amend her claims seeking to recover for injuries due to botched root canals and other treatment that ultimately led to tooth extractions because those injuries were not proximately caused by her alleged abandonment by the Institute, Dr. Atsaves or Dr. Schiller, but were caused by later treatments she received from other providers outside of the Institute. (*See id*.)

---

[20] The Court expresses no opinion with respect to the merits of Plaintiff's breach of contract claim, which would need to be assessed under the federal common law. As noted in footnote 15, *supra*, the Government erroneously relied upon New York state law with respect to the merits of Plaintiff's breach of contract claim, and neither Plaintiff nor the Government provided any analysis of Plaintiff's claim under federal common law.

## CONCLUSION

For the reasons set forth above, it is respectfully recommended that Defendant's motion to dismiss be GRANTED IN PART and DENIED IN PART. Specifically, I recommend that the SAC be dismissed as to all claims, except Plaintiff's claims under the FTCA based upon conduct of the Institute and Dr. Schiller. In addition, I recommend that Plaintiff be given leave to amend her breach of contract claim against the Government so as to abandon any claim for monetary relief in excess of $10,000.00, should she choose to do so.

Dated:     New York, New York
           May 30, 2024


_____
**STEWART D. AARON**
**United States Magistrate Judge**

\*            \*            \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Clarke.

**THE FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW**. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).